Minute Order Form (06/97)



# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | John W. Darrah | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 00 C 7639 | **DATE** | 5/2/2002 |
| **CASE TITLE** | RENA HARDY vs. THE UNIVERSITY OF ILLINOIS | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]
(2) ☐ Brief in support of motion due _____.
(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.
(4) ☐ Ruling/Hearing on _____ set for _____ at _____.
(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(7) ☐ Trial[set for/re-set for] on _____ at _____.
(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.
(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
   ☐ FRCP4(m)  ☐ General Rule 21  ☐ FRCP41(a)(1)  ☐ FRCP41(a)(2).
(10) ■ [Other docket entry] Status hearing held. Enter Memorandum Opinion And Order. Summary judgment as to Hardy's retaliation claim is granted. Defendant's motion for summary judgment is granted. Case is closed. Pretrial conference set for 5/15/02 is stricken. Jury trial set for 5/20/02 is stricken.

(11) ■ [For further detail see order attached to the original minute order.]

| | No notices required, advised in open court. | | | Document Number |
|---|---|---|---|---|
| | No notices required. | | number of notices | |
| | Notices mailed by judge's staff. | | | |
| | Notified counsel by telephone. | | MAY 0 6 2002 date docketed | |
| ✓ | Docketing to mail notices. | | | 34 |
| ✓ | Mail AO 450 form. | | docketing deputy initials | |
| | Copy to judge/magistrate judge. | | | |
| LG | courtroom deputy's initials | | date mailed notice | |
| | | Date/time received in central Clerk's Office | mailing deputy initials | |

RENA HARDY, )
)
Plaintiff, )
) No. 00 C 7639
v. )
) Judge John W. Darrah
THE UNIVERSITY OF ILLINOIS, CHICAGO, )
)
Defendant. )

## MEMORANDUM OPINION AND ORDER

Plaintiff, Rena Hardy ("Hardy"), filed a three-count complaint against Defendant, the University of Illinois, Chicago ("UIC"), alleging sexual harassment, retaliation in violation of Title VII, and intentional infliction of emotional distress. In March 2001, Hardy withdrew her intentional infliction of emotional distress claim. Before this Court is Defendant's Motion for Summary Judgment.

Summary judgment is proper if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact." Fed. R. Civ. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). All the evidence and the reasonable inferences that may be drawn from the evidence are viewed in the light most favorable to the nonmovant. *Miller v. American Family Mutual Ins. Co.*, 203 F.3d 997, 1003 (7th Cir. 2000). However, the nonmovant must still come forward with evidence establishing the elements of its claim on which it bears the burden of proof at trial. As such, it must establish specific facts that show there is a genuine issue for trial. *Miller*, 203 F.3d at 1003.

In the instant case, Hardy has not disputed any of UIC's statements of material facts.

Therefore, all the material facts averred by UIC are deemed admitted because plaintiff failed to controvert such facts. *See Oates v. Discovery Zone*, 116 F.3d 1161, 1167 (7th Cir. 1997); L.R. 56.1(b)(3)(B). Although Hardy failed to respond to UIC's Motion for Summary Judgment, the motion will only be granted if UIC can demonstrate that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. *See Johnson v. Gudmundson*, 35 F.3d 1104, 1112 (7th Cir. 1994).

Hardy began her employment with UIC's west campus. (Def.'s 56.1(a)(3) Statement ¶ 4). Hardy worked at the UIC east campus from approximately 1994 through February 2000. The job title was Building Service Worker, and her general duties included cleaning office buildings and performing related housekeeping assignments. (Id., at ¶ 5).

Building Services is responsible for providing housekeeping services to more than forty buildings on the east campus. The department regularly assigns a number of its employees as "floaters" to cover assignments for absent or unavailable employees or to respond to calls requiring immediate housekeeping attention. (Def.'s 56.1(a)(3) Statement ¶ 51). "Floater" is not a separate job title in Building Services. Nor is the floater assignment a lower-level building Service position. Floaters perform the same tasks and have the same responsibilities as employees who are regularly assigned to work in particular campus buildings, except that floaters report to different buildings, depending on the campus' needs. Building Service employees working as floaters receive the same rate of pay and the same level of benefits as those regularly assigned to the same building. Many Building Service employees who are regularly assigned to particular buildings in the morning serve as floaters for the balance of the day, as circumstances require. There are also employees that serve as floaters on a full-time basis. (Id., at ¶ 53).

2

In February 2000, Hardy was assigned to work in the Outpatient Care Center ("OCC") on the west campus. (Def.'s 56.1(a)(3) Statement ¶ 6). Hardy's responsibilities at the OCC included various housekeeping duties, such as responding to immediate clean-up requests; cleaning patient examination rooms, washrooms, and offices; and emptying trash receptacles and biohazard containers. (Id., at ¶ 7). On Hardy's first day of work at OCC, Willie Green ("Green"), Hardy's supervisor, hugged Hardy and said, "I'm finally working with you." Hardy did not protest Green's conduct and did not complain about the conduct. (Id., at ¶ 26).

Green reported to Winston Atwater ("Atwater") and supervised all of the Building Service employees at OCC. Atwater, in turn, reported to Clarence Bridges ("Bridges"). (Def.'s 56.1(a)(3) Statement ¶ 8). Hardy did not see or interact with Green very much during an average work day. (Id., at ¶ 10). Among the few transactions Green had with Hardy, Green recalls one occasion which Hardy asked if she could use a vacation day to cover an unpaid absence the previous week. Hardy came to Green's office on an approved vacation day and asked if she could work that day and substitute the vacation day for the previous week's absence. Green informed Hardy that she could work that day and save her vacation day but could not apply the vacation day to her previous absence because employees are required to request vacation days in advance. (Id., at ¶ 12). Green also recalled one occasion when he paged Hardy twice to offer her overtime. Green paged Hardy because that was the number listed on the sign-up sheet for overtime. (Id., at ¶ 13).

Throughout his employment in the OCC, Green often used the phrase, "Don't make me do something to you", or words to that effect. Green used the phrase as a lighthearted way of encouraging employees to get back to work. The phrase was well understood by employees in the manner in which it was intended and did not carry any sexual meaning or implication. (Def.'s

3

56.1(a)(3) Statement ¶ 14).

On April 11, 2000, Hardy reported "inappropriate" comments by Green to Atwater. (Def.'s 56.1(a)(3) Statement ¶ 27; Plaint.'s 56.1(a)(3) Statement ¶ 14). Hardy informed Atwater that Green told her she "needed to get some" and that Green had grabbed her and kissed her above the right eyebrow. Atwater has no present recollection of Hardy's specific complaint and recalls receiving a complaint from Hardy regarding differences she was having with Green. Atwater informed Hardy that he would speak with Green about her complaint. (Def.'s 56.1(a)(3) Statement ¶ 29). Atwater contends that Hardy did not complain about sexual harassment to him. (Id., at ¶¶ 27-28).

Later that same day, Hardy called Atwater, and he informed Hardy that he had not yet spoken with Green. (Plaint.'s 56.1(a)(3) Statement ¶ 14). At some point, Atwater discussed Hardy's complaint with both Hardy and Green and concluded that Hardy's problem with Green stemmed from personal differences between the two. Atwater advised Green to communicate professionally at all times and avoid behavior that could be misinterpreted by Hardy or anyone else. Green agreed to do so. (Def.'s 56.1(a)(3) Statement ¶ 29).

On April 26, 2000, Hardy again reported a problem with Green to Atwater. Hardy stated that Green yelled at her in front of co-workers after she complained that her paycheck was not correct. Hardy referred to Green's behavior as "inappropriate" and did not complain to Atwater about any other alleged behavior by Green. (Def.'s 56.1(a)(3) Statement ¶ 30; Plaint.'s 56.1(a)(3) Statement ¶ 14). Atwater twice attempted to schedule a meeting with Hardy and Green to discuss their differences. The first meeting Atwater scheduled, neither Hardy nor Green could attend. Green attended the second meeting, but Hardy did not. Hardy did not contact Atwater again about the matter and did not attempt to reschedule the meeting. (Def.'s 56.1(a)(3) Statement ¶ 31).

4

At some point during Hardy's assignment in OCC, Green spoke with other OCC employees outside the locker room used by Building Service employees. During the conversation, Green and another employee discussed whether they thought a certain female employee who did not work in OCC was attractive and whether either of them might ask the woman for a date. Hardy overheard the conversation and approached them, saying, "I don't want to hear this kind of stuff; I want you to respect me", or words to that effect. Hardy also made reference to being a religious person. (Def.'s 56.1(a)(3) Statement ¶ 15). In response to Hardy's comments regarding the overheard conversation and other unrelated complaints by other employees about profanity at work, Green held a meeting and explained that everyone had to conduct themselves appropriately and professionally at all times. Green also apologized to the group in the event he had ever spoken in a manner which any employee considered inappropriate. (Id., at ¶ 16).

In 2000, UIC had in place a variety of mechanisms and procedures for complaints of perceived unlawful discrimination, including sexual harassment. One of these procedures included reporting and resolving such complaints through UIC's Office of Access and Equity ("Access and Equity"). (Def.'s 56.1(a)(3) Statement ¶ 19). Access and Equity counsels faculty, staff, and students who believe they may have been subjected to unlawful discrimination or harassment. Access and Equity also investigates claims of sexual harassment where a formal complaint is filed. After investigating complaints, Access and Equity makes recommendations to responsible UIC representatives, as appropriate. (Id., at ¶ 20).

Employees are made aware of the functions and services of Access and Equity in several ways. UIC's sexual harassment policy specifically directs employees to Access and Equity. In addition, UIC departmental human resource representatives and union representatives often refer

5

individuals to Access and Equity when they receive a complaint of discrimination or harassment. Access and Equity also places notices in the campus newspapers each semester which are distributed campus-wide and are also available on the UIC website. (Id., at ¶ 21).

When an individual contacts Access and Equity, a Claims Analyst meets with the individual, listens to the facts presented, and initially determines whether the facts indicate a violation of UIC policy. If the complaint relates to the UIC's nondiscrimination and/or anti-harassment policies, the Claims Analyst gives the individual a copy of the applicable policy(ies) and a Request for Further Action form. The Claims Analyst advises the individual to complete the Request for Further Action form and return the completed form to Access and Equity. (Def.'s 56.1(a)(3) Statement ¶ 22). After receiving the completed Request for Further Action form, Access and Equity prepares a list of the allegations that is reviewed by the Associate Chancellor. After the allegations are finalized, the Claims Analyst contacts and meets with the accused to present the allegations and explains the investigation process. The accused is given ten days to respond in writing to the allegations. (Id., at ¶ 23).

The Claims Analyst then interviews the accused, any witnesses suggested by the parties, and any other relevant witnesses. When witness interviews are completed, the Claims Analyst drafts a report regarding the evidence obtained, makes findings, and presents the findings to an Access and Equity panel, which decides whether a policy has been violated and makes the necessary recommendations. (Id., at ¶ 24). The Claims Analyst delivers a summary of the investigation to the complainant. If, after ten days, neither party contests the findings, they become final. If either party contests the findings, Access and Equity responds, and the respective Vice Chancellor issues a written decision to both parties and Access and Equity. (Id., at ¶ 25).

6

Hardy was aware of UIC's various mechanisms for internal employee complaints of unlawful harassment and discrimination prior to February 2000. Hardy knew that Access and Equity handled employee complaints of sexual harassment and that the Affirmative Action Office, the predecessor to Access and Equity, received complaints of discrimination. Records indicate that Hardy made other complaints to Access and Equity, including complaints of sexual harassment, in July 1995, April 1995, January 1995, August 1994, and August 1990. (Def.'s 56.1(a)(3) Statement ¶ 33).

On May 3, 2000, Hardy complained of harassment to Tonya Harper ("Harper") of Access and Equity. Hardy informed Harper that Green had treated her inappropriately by saying, "she needed to get some from her husband and/or boyfriend", hugging her on two different occasions, and kissing her on the eyebrow. Hardy explained that she was not prepared to provide a detailed account of her allegations and could not remember the specific chronology of events. Harper provided Hardy with a Request for Further Action form and advised her to submit the form to Access and Equity as soon as she was able to provide an account of what had allegedly occurred. (Def.'s 56.1(a)(3) Statement ¶ 34).

Afterwards, Harper informed Bridges that Hardy had lodged a complaint with Access and Equity, alleging that Green had sexually harassed her. (Def.'s 56.1(a)(3) Statement ¶ 35). Bridges contacted Hardy and asked her why she had never complained to him about Green and asked her if she wanted him to have a meeting with her and Green to help resolve the situation. Hardy told Harper that she would let Bridges know, but he never heard back from her. (Id., at ¶ 37).

In mid-May 2000, Bridges transferred Hardy from OCC to the east campus to handle floater assignments. Bridges made the transfer because of departmental staffing needs, as there were a number of temporary vacancies that needed to be filled. As a result of Hardy's transfer, Hardy

suffered no reduction in pay, lost no benefits, and her job title did not change. Her job duties remained the same, except she no longer worked in OCC with Green. (Def.'s 56.1(a)(3) Statement ¶ 55). In the floater position, Hardy had to wait until after she got to work for everyone else to go to their designated building before she knew where she would work on any given day. (Plaint.'s 56.1(a)(3) Statement ¶ 23). Within a week of her transfer as a floater, Hardy went to see Bridges with her union representative and complained about her floater assignment. Hardy asked to be transferred back to OCC. In response to the request, Hardy was transferred back to OCC the next week. (Def.'s 56.1(a)(3) Statement ¶¶ 56-57). In mid-May 2000, Green was transferred out of OCC to work in the Medical Center. (Id., at ¶ 59).

On or about July 26, 2000, Hardy filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC"), alleging sexual harassment and retaliation. (Def.'s 56.1(a)(3) Statement ¶ 60). On June 27, 2000, Hardy saw Dr. Judy Law, who diagnosed her with depression and gave her a note stating that she could no longer work. (Plaint.'s 56.1(a)(3) Statement ¶ 27). Hardy stopped actively working at UIC on June 27, claiming that she was not "enthused about going to work". Hardy officially resigned from her position with UIC in July 2001. (Def.'s 56.1(a)(3) Statement ¶¶ 17-18).

Although dated May 3, 2000, Hardy did not submit her written Request for Further Action form to Access and Equity until mid-or-late July 2000. The Request for Further Action form alleged that Green had harassed Hardy: (1) on her first day on the job, when, while showing her where supplies were kept, he put his arm around her and said, "I finally got you over here; we're finally working together"; (2) in the second week of March 2000, when he put his fingers through her hair and said, "I like your hair like this"; (3) when he paged her repeatedly to "see if [she] was all right;

8

if [she] was OK because [she] called in and he wanted to make sure [she] was OK"; (4) on April 3, 2000, when, after refusing to let Hardy use a vacation day to cover a previous absence and yelling at her in front of co-workers to "get out of his office and go home", Green hugged her and told her she had been difficult ever since she was transferred to OCC, kissed her above her right eyebrow, and said, "You know you're not supposed to be wearing those types of clothes .. it/you do something to me"; (5) on April 4, 2000, when he told her, "You need somebody to do something to you"; (6) on April 5, 2000, when he told her, "You must have had some last night; you're so quiet"; (7) on April 10, 2000, when he told her he was "going to do something to her"; (8) on April 11, 2000, when he stepped out into the hallway in his "work pants and his undershirt", saying, "Look, they're clean, and later said, "Rena, are you scared to look at me or something," told her, "You need some" and told the co-worker she was with at the time (Allen) to "leave her down here with me"; (9) on April 12, 2000, when, during a staff meeting, he said to her, "You haven't done nothing for me" and "You need to go home and get some from your husband or your boyfriend or something"; and (10) on April 25, 2000, when he hugged her like before and said, "Rena's the only one I want". (Def.'s 56.1(a)(3) Statement ¶ 38). Hardy also alleged that Green short-changed her on time by changing the hours she worked and yelled at her in front of co-workers. (Id., at ¶ 39).

On July 24, 2000, Patricia Gill ("Gill"), Associate Chancellor for Access and Equity, wrote Green and informed him of Hardy's allegations and requested a written response to each allegation. (Def.'s 56.1(a)(3) Statement ¶ 41). Harper also investigated each of Hardy's allegations. As part of the investigation, Harper interviewed Hardy, Green, and ten other individuals who were identified as persons with knowledge of the allegations. (Id., at ¶ 42). Green provided Access and Equity his written response on July 26, 2000. (Id., at ¶ 43).

9

In October 2000, Harper prepared a confidential report detailing the investigation of Hardy's complaint, the conclusions of Access and Equity, and Access and Equity's recommended resolution of Hardy's allegations. (Def.'s 56.1(a)(3) Statement ¶ 44). In mid-October, Gill wrote Hardy, describing the investigation that was conducted and summarizing the findings of Access and Equity regarding her allegations. (Id., at ¶ 45). Gill advised Hardy that its investigation could not independently substantiate Hardy's allegations that: (1) Green put his arm around her and said, "I finally got you over here; we're finally working together"; (2) Green put his fingers through her hair and said he "liked [her] hair like this"; that Green yelled at her to "get out of his office and go home" after she asked to use a vacation day to cover an absence, hugged her, kissed her on the right eyebrow, and said, "[She} had been difficult since [her] transfer" and told her that her clothes "did something to him"; (3) Green stepped into the locker room hallway in front of Hardy in his undershirt and pants, asked her if she was "scared to look at [him]", commented that she "needed to get some" and asked another employee to "leave Hardy down there with [him]"; and (4) Green, in a staff meeting, said Hardy "hadn't done nothing for me" and "needed to get some from [her] husband or boyfriend or something". (Id., at ¶ 46). Gill also advised Hardy that her allegation that Green hugged her in the employee locker room and said, "Rena's the only one I want", could only be substantiated through a witness who said Green gave Hardy a friendly shoulder hug. (Id., at ¶ 47).

Gill advised Hardy that Access and Equity could substantiate Hardy's allegations that Green repeatedly paged her even though she called in sick because Green admitted paging her on one occasion. Access and Equity also substantiated her allegations that Green told her she "needed to get some" and/or she "needed someone to do something to [her]", and, on the following day, commented that she "must have had some last night because [she] was so quiet". Although Access

10

and Equity could substantiate Hardy's allegation that Green said he "would do something" to her because Green admitted using the phrase with several friends, the evidence indicated that the phrase had no sexual connotation. (Def.'s 56.1(a)(3) Statement ¶ 48).

With respect to the four allegations that could be substantiated, Access and Equity advised Hardy that it had concluded that the conduct did not rise to a level that violated UIC's sexual harassment policy. Nevertheless, Access and Equity recommended that Green receive a written warning because he had engaged in certain inappropriate conduct toward Hardy. Gill also advised Hardy that she had ten days in which to file written comments with both Access and Equity and the Vice Chancellor for Administration regarding the findings. Hardy did not file written comments with either Access and Equity or the Vice Chancellor's office. (Def.'s 56.1(a)(3) Statement ¶ 49). In late-October 2000, Green was issued a written disciplinary warning as a result of Hardy's complaint and Access and Equity's findings. (Id., at ¶ 50).

Sexual Harassment Claim

Sexual harassment, under Title VII, arises when conduct has "the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive work environment." *Wolf v. Northwest Ind. Symphony Soc'y*, 250 F.3d 1136, 1143 (7th Cir. 2001) (internal quotation marks and citations omitted). The conduct must be sufficiently severe or pervasive that it would be hostile to a reasonable person, and the victim must subjectively see it as abusive. *Hertzberg v. Sram Corp.*, 261 F.3d 651, 658 (7th Cir. 2001).

Whether a work environment is sufficiently hostile or abusive is judged by looking at all of the circumstances, including: the severity of the conduct; the frequency of the conduct, whether it is humiliating or physically threatening, or a mere offensive utterance; and whether it unreasonably

11

interferes with a person's work performance. *Clark County Sch. Dist. V. Breeden*, 532 U.S. 268, 270-72 (2001) (*Breeden*). Offhand comments, simple teasing, and isolated incidents (unless extremely serious) do not amount to a hostile or abusive work environment. *Breeden*, 532 U.S. at 271. Furthermore, a plaintiff must demonstrate that she or he was harassed because of their sex. *Spearman v. Ford Motor Co.*, 231 F.3d 1080, 1085 (7th Cir. 2000) (*Spearman*).

UIC argues that summary judgment is appropriate because Green's conduct was not sufficiently severe or pervasive to constitute a hostile work environment.

Green's alleged inappropriate conduct took place in a relatively short time period, from February 2000 through April 25, 2000. Green's conduct included physical contact with Hardy, including, once, running his fingers through her hair, kissing her on the right eyebrow, and, twice, hugging her. Green also made several comments to Hardy that were based on Hardy's sex; these comments included, "You know you're not supposed to be wearing those types of clothes .. it/you do something to me"; "You must have had some last night; you're so quiet"; "Rena's the only one I want"; "You need to go home and get some from your husband or your boyfriend or something"; and telling Hardy she "need[ed] some". The number of incidents and the type of incidents that occurred in a relatively short time period, including both unwanted physical touching and multiple comments with sexual innuendo, establish a genuine issue of fact whether a reasonable person would find Hardy's work environment to be hostile.

UIC also argues that summary judgment is appropriate because it exercised reasonable care to prevent and promptly correct the harassing behavior and Hardy failed to reasonably take advantage of UIC's corrective opportunities.

If an employee is subjected to a hostile work environment and no tangible employment action

12

is taken against the employee, a defending employer may raise an affirmative defense to liability or damages. *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 765 (1998) (*Ellerth*). The defense is comprised of two elements: (1) "the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior" and (2) "the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise". *Ellerth*, 524 U.S. at 765.

It is undisputed that UIC had in place policies and procedures by which employees could complain about sexual harassment as well as other types of discrimination. Furthermore, once Hardy used the available procedure, by issuing a complaint to Access and Equity, no further inappropriate conduct occurred. Accordingly, UIC has established the first element of the affirmative defense.

Hardy alleges that the sexual harassment began on her first day of work at OCC. However, she did not speak to Green's supervisor until approximately six weeks after the initial incident and only after other incidents occurred, including incidents on April 3, 5, and 10. Hardy does not dispute that Green's supervisor, Atwater, believed that Hardy's complaint of April 11 was not about sexual harassment. It is also undisputed that Hardy failed to attend two meetings Atwater had scheduled to try to resolve the situation between Hardy and Green.

Hardy also complained to Atwater on April 26, 2000. However, Hardy complained that Green yelled at her in front of co-workers after she complained that her paycheck was not correct. Hardy referred to Green's behavior as "inappropriate" but did not complain about any other behavior by Green. Hardy has not made any allegations of inappropriate conduct by Green after April 25, 2000.

A week after the alleged inappropriate conduct ceased, Hardy contacted Access and Equity

13

for the first time. When she first contacted Access and Equity, Hardy did not provide a complete history of the alleged conduct. It was not until mid- or late-July that Hardy completed her Request for Further Action form wherein she first set forth with detail the allegations against Green. Hardy had ceased working at UIC over a month prior to filing the form.

It is undisputed that Hardy was aware of Access and Equity and had previously filed complaints with Access and Equity in 1995, 1994, and 1990, including a different complaint of sexual harassment.

The above demonstrates that UIC has also established the second element of the affirmative defense. Hardy's actions establish that Hardy unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to otherwise avoid the alleged harm, including: waiting several weeks to initially complain about the alleged sexual harassment; providing incomplete details about the conduct that lead Atwater to believe that Hardy was not complaining about sexual harassment; failing to attend meetings to address the situation after complaining; not availing herself to the available procedures that were specifically put into place for complaints of sexual harassment and discrimination until months after the alleged harassment began and after the alleged conduct ceased, with knowledge of the procedure as evidenced by previously availing herself to the procedure; and not providing a full description of the conduct for over two months after filing the initial complaint, and only after no longer working at UIC.

Accordingly, summary judgment as to Hardy's sexual harassment claim is granted.

Retaliation Claim

Title VII not only protects persons from certain forms of job discrimination and harassment but also from retaliation for complaining about the types of discrimination it prohibits. *Spearman*,

231 F.3d at 1086. To prevail on a claim of retaliation, a plaintiff must offer direct evidence of retaliation or proceed under an adaptation of the *McDonnell Douglas* burden-shifting method. *Stone v. City of Indianapolis Pub. Utilities Div.*, 281 F.3d 640, 644 (7th Cir. 2002) (*Stone*).

Under the direct method, the plaintiff must present direct evidence (evidence that establishes without resort to inferences from circumstantial evidence) that she engaged in a protected activity and, as a result, suffered an adverse employment action. *Stone*, 281 at 644. If this is established, the defendant can defeat plaintiff's claim if it can present unrebutted evidence that it would have taken the adverse employment action against the employee even if he had had retaliatory motive. *Stone*, 281 F.3d at 644.

Under the adaptation of the *McDonnell Douglas* burden-shifting method, the plaintiff must show that, after she filed a charge, she, and no other similarly situated employee who did not file a charge, was subjected to an adverse employment action even though she was performing her job in a satisfactory manner. *Stone*, 281 F.3d at 644. If this is established, the defendant can defeat plaintiff's claim if it can present unrebutted evidence of a noninvidious reason for the adverse action. *Stone*, 281 F.3d at 644.

As shown above, under either method of proof, a plaintiff must establish an adverse employment action. *See Stone*, 281 F.3d at 644. An adverse employment action "constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits as well as the denial of a raise or promotion." *Spearman*, 231 F.3d at 1086 (internal quotations and citations omitted). Reassignment to an essentially equivalent position or assignment that is an alteration of job responsibilities or a mere inconvenience do not constitute an adverse employment

15

action. *See Spearman*, 231 F.3d at 1086; *Place v. Abbott Laboratories*, 215 F.3d 803, 810 (7th Cir. 2000) (*Place*).

In the present case, Hardy alleges that her reassignment to the position as a "floater" constitutes an adverse employment action because she was required to wait until every employee had been dropped off at their designated building before she was assigned a place to work.

It is undisputed that Hardy's title, pay, benefits, and her job responsibilities did not change when she was transferred to the floater position. The only difference in her position was not having a designated building to work and the need to sit on the company bus longer than previously required. Hardy's reassignment did not constitute a significant change in responsibilities. Instead, it was a position with identical responsibilities that included a mere inconvenience to Hardy. As such, the reassignment did not constitute an adverse employment action. *See Spearman*, 231 F.3d at 1086 (additional task of cleaning windows of press not an adverse employment action); *Place*, 215 F.3d at 810) (transfer to position that employee did not like as much as previous position does not constitute an adverse employment action).

Accordingly, summary judgment as to Hardy's retaliation claim is granted.

Based on the foregoing, Defendant's Motion for Summary Judgment is granted.

Dated: May 2, 2002

JOHN W. DARRAH
United States District Judge